# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2016AP1631 |
| COMPLETE TITLE: | Steadfast Insurance Company,<br>　　　Plaintiff-Respondent,<br>　　v.<br>Greenwich Insurance Company,<br>　　　Defendant-Appellant-Petitioner. |

REVIEW OF DECISION OF THE COURT OF APPEALS
Reported at 380 Wis. 2d 184, 908 N.W.2d 502
PDC No:　2018 WI App 11 - Published

| | |
|---|---|
| OPINION FILED: | January 25, 2019 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | October 29, 2018 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
| 　COURT: | Circuit |
| 　COUNTY: | Milwaukee |
| 　JUDGE: | Glenn H. Yamahiro |

| | |
|---|---|
| JUSTICES: | |
| 　CONCURRED: | A.W. BRADLEY, J. concurs and dissents, joined by DALLET, J. (opinion filed).<br>R.G. BRADLEY, J. concurs and dissents (opinion filed). |
| 　DISSENTED: | |
| 　NOT PARTICIPATING: | |

ATTORNEYS:

For the defendant-appellant-petitioner, there were briefs filed by *Pamela J. Tillman*, *Esq.*, *Michael J. Cohen*, *Esq.*, and *Meissner Tierney Fisher & Nichols S.C.*, Milwaukee; with whom on the briefs were *Thomas G. Drennan*, *Esq.*, and *Dinsmore & Shohl LLP*, Chicago, Illinois. There was an oral argument by *Michael J. Cohen*.

For the plaintiff-respondent, there was a brief filed by *Monte E. Weiss*, *Charles W. Kramer*, and *Weiss Law Office*, *S.C.*, Mequon. There was an oral argument by *Monte Weiss*.

**2019 WI 6**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

No. 2016AP1631
(L.C. No. 2013CV1685)

STATE OF WISCONSIN        :        IN SUPREME COURT

**Steadfast Insurance Company,**

     **Plaintiff-Respondent,**

  **v.**

**Greenwich Insurance Company,**

     **Defendant-Appellant-Petitioner.**

**FILED**

**JAN 25, 2019**

Sheila T. Reiff
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals. *Affirmed in part, reversed in part.*

¶1   PATIENCE DRAKE ROGGENSACK, C.J.  We review a decision of the court of appeals[1] affirming the circuit court's[2] grant of summary judgment to Steadfast Insurance Company (Steadfast). Summary judgment granted Steadfast the right to recover from

---

[1] Steadfast Ins. Co. v. Greenwich Ins. Co., 2018 WI App 11, 380 Wis. 2d 184, 908 N.W.2d 502.

[2] The Honorable Glenn H. Yamahiro of Milwaukee County presided.

Greenwich Insurance Company (Greenwich) based on Steadfast's and Greenwich's relationships with Milwaukee Metropolitan Sewerage District (MMSD), who was sued for alleged negligent inspection, maintenance, repair, and operation of Milwaukee's sewerage system.

¶2   MMSD tendered its defense to both Steadfast and Greenwich. Steadfast accepted the tender; Greenwich did not, claiming that its policy was excess to Steadfast's based on its "other insurance" clause. Steadfast disagreed and sued Greenwich to recover the defense costs it paid to MMSD and the attorney fees incurred in suing Greenwich to reimburse it for those defense costs.

¶3   First, we conclude that Greenwich, who insured the risk that United Water Services Milwaukee, LLC (United Water) would negligently perform services for MMSD, thereby causing damage, and Steadfast, who for a different period of time insured the risk that Veolia Water Milwaukee, LLC (Veolia) would negligently perform services for MMSD, thereby causing damage, were both primary and successive insurers in regard to MMSD, their common additional insured.[3]

---

[3] Veolia Water North American Central, LLC, d/b/a Veolia Water Milwaukee, LLC, is a wholly owned subsidiary of WASCO LLC, who is the actual named insured on the Steadfast policy. Veolia and United Water were sued for sewage backups as well as MMSD.

¶4 Second, we conclude that Greenwich breached its contractual duty to defend MMSD. Third, we conclude that Steadfast's contractual subrogation claim against Greenwich was timely filed as it comes within the six-year statute of limitations for contract actions.

¶5 Fourth, we conclude Steadfast had a contractual duty to defend MMSD that was not abrogated by Greenwich's breach of its contractual duty to defend MMSD. Therefore, we apply a pro-rata allocation of defense costs Steadfast paid to MMSD based on Steadfast's and Greenwich's respective policy limits of $30 million and $20 million. Fifth, and finally, we conclude that Steadfast is entitled to recover attorney fees from Greenwich due to Steadfast's stepping into the shoes of MMSD through contractual subrogation to force Greenwich to pay defense costs.

¶6 Accordingly, we affirm the decision of the court of appeals in part and reverse it in part.

## I. BACKGROUND

¶7 This dispute arises out of historic rains that occurred in Milwaukee in June 2008. Those heavy rains overwhelmed MMSD's sewerage system, which resulted in raw sewage backing up into more than 8,000 homes. Lawsuits were filed against United Water, Veolia and MMSD because of sewage backups,

alleging negligence in the repair, maintenance, and operation of the sewerage system both before and during the heavy rains.[4]

¶8 Beginning in 1998, MMSD entered into Operating Agreements with private companies to operate and maintain its sewerage system. United Water provided operational services for many years. MMSD's Operating Agreement with United Water required United Water to maintain comprehensive liability insurance, naming MMSD as an additional insured. United Water contracted with Greenwich for liability insurance with the last contract of insurance beginning July 24, 2007 and ending July 24 2008; it named MMSD as an additional insured. The Greenwich policy limits were $20 million. United Water maintains that it last provided services under an Operating Agreement with MMSD on February 29, 2008.

¶9 Beginning on March 1, 2008, and continuing through the June 2008 heavy rains, MMSD contracted with Veolia to operate and maintain its sewerage system. Their Operating Agreement similarly required Veolia to maintain comprehensive liability insurance, naming MMSD as an additional insured. Steadfast

---

[4] Banicki, et al. v. Veolia, et al., Milwaukee Cty. Case No. 09-CV-1860; Westmoreland v. Veolia, et al., Milwaukee Cty. Case No. 09-CV-6121; FM Global v. Veolia, et al., Milwaukee Cty. Case No. 09-CV-7594; Reep, et al. v. City of Milwaukee, et al., Milwaukee Cty. Case No. 09-CV-3483. FM Global and Westmoreland were eventually consolidated into Banicki.

provided the required insurance to Veolia, with policy limits of $30 million.

¶10 The Greenwich policy obligated it to defend any claim against its insureds, United Water and MMSD, as well as to provide indemnification:

> With respect to the insurance afforded by this Policy, the Company shall defend any CLAIM against the INSURED seeking DAMAGES to which this insurance applies, even if any of the allegations are groundless, false or fraudulent. Defense counsel may be designated by the Company or designated by the INSURED . . . .

¶11 In a similar fashion, the Steadfast policy gave Steadfast "the right and duty to assume the adjustment, defense and settlement of any 'claim' to which this insurance applies." Steadfast's policy, which insured Veolia and MMSD, also contained a subrogation clause, which stated in relevant part:

> In the event of any payment under this policy, we shall be subrogated to all an "insured's" rights of recovery against any person or organization. An "insured" shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights. An "insured" shall do nothing to prejudice such rights.

¶12 After MMSD tendered its defense to both Steadfast and Greenwich, it opted to hire its own counsel. The lawsuits were settled without MMSD paying plaintiffs' claimed damages. Steadfast participated in MMSD's defense by reimbursing MMSD for $1.55 million in defense costs. However, when MMSD tendered its defense to Greenwich and Steadfast, there was no way of knowing that settlement would be achieved without paying something toward claimed damages.

5

¶13 Greenwich, who had refused MMSD's tender, had sent MMSD a letter explaining that "we fail to see how [United Water] could be liable for causing a sewage backup in June 2008 when its services for MMSD terminated in February 2008." Greenwich further argued that "there is ample evidence that when [United Water] turned over operational responsibilities to Veolia and MMSD in February 2008, all systems, equipment, and machinery at the subject sewage overflow diversion chamber were functioning according to operational protocols."

¶14 One year later, MMSD renewed its tender to Greenwich. It informed Greenwich that United Water had been named as a defendant in lawsuits that resulted from the 2008 sewage backups. Greenwich responded five months later, acknowledging that "there may be a potential for coverage" and requesting "additional information in order to determine Greenwich's current coverage obligations." After receiving the requested information, including confirmation that MMSD had satisfied its $250,000 self-insured retention amount, Greenwich continued to refuse the tender of MMSD's defense. Instead, it unilaterally determined based on its "other insurance" clause that its policy was excess to Steadfast's $30 million liability limit.

¶15 After the conclusion of the lawsuits that resulted from the sewage backups, Steadfast sued Greenwich to recover the $1.55 million in defense costs that it had paid to MMSD. The circuit court granted summary judgment in favor of Steadfast, awarding it the entire amount Steadfast paid MMSD, as well as

$325,000 in attorney fees that Steadfast incurred bringing this lawsuit.

¶16 The court of appeals affirmed. <u>Steadfast Ins. Co. v. Greenwich Ins. Co.</u>, 2018 WI App 11, ¶4, 380 Wis. 2d 184, 908 N.W.2d 502. The court of appeals based its decision on the following conclusions:

> (1) Greenwich's policy provided primary, not excess, coverage for claims against MMSD; (2) MMSD has established that it met the $250,000 risk retention amount by incurring $594,302.23 in defense costs; (3) Steadfast's equitable subrogation claim is timely because the six-year statute of limitations in Wis. Stat. § 893.43 applicable to contract claims applies to Steadfast's claim, which is premised on Greenwich's breach of the duty to defend MMSD; (4) under the facts of this case, because Greenwich breached its duty to defend MMSD, Greenwich is not equitably entitled to an allocation of MMSD's defense costs; and (5) under the facts of this case, Steadfast is equitably entitled to recover attorney fees in this lawsuit.

<u>Id.</u> We granted Greenwich's petition for review, and now affirm in part and reverse in part.

## II. DISCUSSION

### A. Standard of Review

¶17 We review summary judgment decisions independently, applying the same methodology as the circuit court and the court of appeals, while benefitting from their discussions. <u>Dufour v. Progressive Classic Ins. Co.</u>, 2016 WI 59, ¶12, 370 Wis. 2d 313, 881 N.W.2d 678.

¶18 We also review insurance contract clauses independently of decisions of the circuit court and court of

7

appeals, while again benefitting from their discussions. Wadzinski v. Auto-Owners Ins. Co., 2012 WI 75, ¶10, 342 Wis. 2d 311, 818 N.W.2d 819. Therefore, whether a party is entitled to attorney fees based on contractual subrogation is a question of law for our independent review. Estate of Kriefall v. Sizzler USA, 2012 WI 70, ¶16, 342 Wis. 2d 29, 816 N.W.2d 853.

¶19 Determining which statute of limitations applies to contract issues involves a question of law that we also decide independently. Zastrow v. Journal Commc'ns, Inc., 2006 WI 72, ¶12, 291 Wis. 2d 426, 718 N.W.2d 51. And finally, the proper measure of damages for an insurer's breach of a contractual duty to defend is likewise a question of law that we review independently. Newhouse v. Citizens Sec. Mut. Ins. Co., 176 Wis. 2d 824, 837, 501 N.W.2d 1 (1993).

## B. Contract Interpretation

¶20 The issues in this case all stem from Greenwich's insurance contract with United Water and Steadfast's insurance contract with Veolia. Each policy listed MMSD as an additional insured. Therefore, the following general principles of contract interpretation guide our initial discussion. Wadzinski, 342 Wis. 2d 311, ¶11.

¶21 Our general task in contract interpretation is to determine and carry out the parties' intentions. Preisler v. Gen. Cas. Ins. Co., 2014 WI 135, ¶18, 360 Wis. 2d 129, 857 N.W.2d 136. The parties' intentions are presumed to be expressed in the language of the contract. Wadzinski, 342 Wis. 2d 311, ¶11. Where the language of a contract is

8

unambiguous and the parties' intentions can be ascertained from the face of the contract, we give effect to the words they employed. Estate of Kriefall, 342 Wis. 2d 29, ¶21. However, if the policy terms are ambiguous, we construe the policy from the perspective of a reasonable insured. Wadzinski, 342 Wis. 2d 311, ¶11.

### 1. Risk and Loss

¶22 Greenwich and Steadfast issued comprehensive liability insurance policies, which their Operating Agreements with MMSD required. As a general matter, liability policies insure risks that are dependent on various circumstances that cause insureds to obtain insurance coverage. Couch on Insurance § 101:3 (3rd ed. 1999). Stated otherwise, risk is the "type of liability the insurer agreed to provide coverage for under the terms of the policy." Id. There is a causal connection between risk and loss.[5] Id. That is, when the insured-for risk occurs, the insurer indemnifies for the resulting-loss (damages) in accord with the policy provisions. Id. Insurance policy clauses "may come into conflict" when two or more policies cover the same risk for the same period of time. Id., § 219:2.

---

[5] The Illinois Supreme Court recently provided a useful distinction between risk and loss in the insurance context. Courts analyze risk by looking prospectively at what the parties set out to cover. Home Ins. Co. v. Cincinnati Ins. Co., 821 N.E.2d 269, 281 (Ill. 2004). Loss, in contrast, is analyzed retrospectively by looking at the injury or damages actually sustained in a particular case. Id.

9

¶23  In the context presented herein, Greenwich's policy insured the risk that United Water's conduct in managing the Milwaukee sewerage system during the policy period would be negligent, thereby causing damage to a third party.[6]  As an "additional insured" under the Greenwich policy, MMSD's risk was that it would be responsible in money damages for a third party's damage caused by United Water's negligence.

¶24  Steadfast's policy insured the risk that Veolia would negligently manage the Milwaukee sewerage system during the policy period, causing damage to a third party.[7]  As an

---

[6] The Greenwich policy provides in relevant part:  <u>Coverage B – CONTRACTOR'S POLLUTION LEGAL LIABILITY</u>

To pay on behalf of the INSURED all LOSS, in excess of the Retention amount . . . which the INSURED becomes legally obligated to pay as a result of an OCCURRENCE which arises out of CONTRACTING SERVICES and which first commenced during the POLICY PERIOD.

. . . .

G.   INSURED means the NAMED INSURED and:

. . . .

    7.    Solely as respects <u>Coverage B – Contractor's Pollution Legal Liability</u>, the client for whom the NAMED INSURED performs or performed covered CONTRACTING SERVICES . . . .

[7] The Steadfast policy provides in relevant part:  CONTRACTOR'S POLLUTION LIABILITY . . . .

We will pay on behalf of an "insured" any "loss" an "insured" is legally obligated to pay as a result of a "claim" caused by a "pollution event" resulting from "covered operations" or "completed operations" of the "covered operations" and provided that the "covered operations" must commence on or after the

(continued)

10

"additional insured" of Steadfast, MMSD's risk was that it would be responsible in money damages for a third party's damage caused by Veolia's negligence.  The plain language of both the Greenwich policy and the Steadfast policy obligated insurers to indemnify and defend their named insureds and MMSD against claims of damage caused by the negligence of their named insureds.  To clarify further, while United Water was not providing services at the time of the flooding, it was alleged that its services during an earlier time when it was managing the MMSD system were a cause of the resulting damage.

¶25  "Other insurance" clauses may be raised in disputes between two insurance companies about whose policy is primary and therefore must pay first and whose policy is excess, also referred to as successive insurance, and pays subsequent to the primary payment.  Plastics Eng'g Co. v. Liberty Mut. Ins. Co., 2009 WI 13, ¶48, 315 Wis. 2d 556, 759 N.W.2d 613.  To explain further, policies may be concurrent, i.e., cover the same time period and risk, or successive, i.e., cover different time

"retroactive date" and before the end of the "policy period" and the "claim" is first made against the "insured" during the "policy period" . . . .

. . . .

L.  "Insured" means:

   1.  You or your; . . .

   4.  Any other person or organization endorsed onto this
       policy as an "insured."   (Milwaukee Metropolitan
       Sewerage District is an endorsee.)

11

periods and risks. However, "other insurance" clauses do not apply unless two policies are concurrent. Id. "The accepted meaning of 'other insurance' provisions does not include application to successive insurance policies." Id. If the "other insurance" clauses cannot be used to establish a primary and an excess insurer, then "neither insurer is given priority over the other and each contributes toward the loss pro rata." Oelhafen v. Tower Ins. Co., 171 Wis. 2d 532, 536-37, 492 N.W.2d 321 (Ct. App. 1992) (citing Schoenecker v. Haines, 88 Wis. 2d 665, 672, 277 N.W.2d 782 (1979)).

¶26 As we have explained, concurrent insurance is required before "other insurance" clauses are triggered. Two insurance policies cannot be concurrent unless they insured "the same risk, and the same interest, for the benefit of the same person, during the same period." Plastics Eng'g, 315 Wis. 2d 556, ¶48 (quoting Douglas R. Richmond, Issues and Problems in "Other Insurance," Multiple Insurance, and Self-Insurance, 22 Pepp. L. Rev. 1373, 1376-82 (1995)).

¶27 The Greenwich and Steadfast policies were primary with regard to each company's respective insurance of United Water and Veolia. The policies were primary and successive in regard to insuring MMSD's risk of damage because each policy relied on the negligence of a different insured, whose alleged negligence occurred during a different period of time, i.e., while that primary insured was maintaining the sewerage system. Stated otherwise, Greenwich would owe MMSD only if the negligence of United Water caused damages for which MMSD was held responsible

12

and Steadfast would owe MMSD only if the negligence of Veolia caused damages for which MMSD was held responsible. Accordingly, we do not interpret the terms of the "other insurance" clauses because under the undisputed facts as set out above, Greenwich's "other insurance" clause provided successive insurance to MMSD.

¶28 In addition, the duty to defend is broader than the duty to indemnify. Acuity v. Bagadia, 2008 WI 62, ¶52, 310 Wis. 2d 197, 750 N.W.2d 817 (explaining that the duty to defend arises from allegations in the complaint, while the duty to indemnify is dependent on fully developed facts). Furthermore, when an insurance policy provides potential coverage for one claim alleged in a lawsuit, the insurer must defend the entire suit, even when the claims are groundless. Fireman's Fund Ins. Co. of Wis. v. Bradley Corp., 2003 WI 33, ¶21, 261 Wis. 2d 4, 660 N.W.2d 666. Accordingly, two insurance policies that insure separate and distinct risks may nevertheless become implicated in the same lawsuit, causing the two insurers to defend the same loss in the form of their mutual insured's alleged liability for damages and defense costs.

2. Greenwich Breached Its Duty To Defend

¶29 We have established a procedure for an insurance company to follow when it disputes coverage. Wis. Pharmacal Co., LLC v. Neb. Cultures of Cal., Inc., 2016 WI 14, ¶18, 367 Wis. 2d 221, 876 N.W.2d 72 (explaining that an insurer may avoid breaching its duty to defend by requesting a bifurcated trial on the issues of coverage and liability, with liability determined

13

after coverage has been established); Newhouse, 176 Wis. 2d at 836 (stating that the insurer should request a bifurcated trial on the issues of coverage and liability when coverage is disputed). An insurer who fails to follow this procedure risks breaching its duty to defend if its coverage determination was wrong. Id. at 837.

¶30 Alternatively, an insurer may choose to reject the insured's tender of defense based on its determination that the claim is not covered under the policy. However, it does so at its own risk. Marks v. Houston Cas. Co., 2016 WI 53, ¶41 n.21, 369 Wis. 2d 547, 881 N.W.2d 309. If the insurer is wrong about its potential coverage obligation, it "is guilty of a breach of contract which renders it liable to the insured for all damages that naturally flow from the breach." Id. (citing Newhouse, 176 Wis. 2d at 837). Finally, as mentioned earlier, an insurer has a duty to defend the entire lawsuit "when an insurance policy provides [potential] coverage for even one claim made in a lawsuit." Fireman's Fund Ins. Co., 261 Wis. 2d 4, ¶21.

¶31 In this case, Greenwich did not seek a judicial determination of its coverage obligations, nor did it pay any amount toward MMSD's defense costs. Instead, it chose to rely on its own unilateral determination that its policy was excess to Steadfast's. As we have explained, Greenwich's unilateral determination was erroneous; Greenwich's policy provided potential coverage for a claim made in lawsuits based on sewage backups. Therefore, Greenwich breached its duty to defend, and

14

it is responsible for all damages that naturally flow from the breach. Marks, 369 Wis. 2d 547, ¶41 n.21.

### 3. Steadfast's Contractual Subrogation Claim

¶32 Steadfast asserts that it has a contractual subrogation claim against Greenwich due to its payment of $1.55 million in defense costs and Greenwich's failure to provide a defense. Greenwich asserts that if Steadfast has a claim, it sounds in contribution, not subrogation. Greenwich further asserts that the time has passed in which to bring a contribution claim.

¶33 Subrogation is the "substitution of one party for another whose debt the party pays, entitling the paying party to rights, remedies, or securities that would otherwise belong to the debtor." Dufour, 370 Wis. 2d 313, ¶15. "The doctrine of subrogation enables an insurer that has paid an insured's loss . . . to recoup that payment from the party responsible for the loss." Id. (citations omitted). The insurer "steps into the shoes" of its insured and pursues the legal rights or claims to which the insured would have been entitled. Wilmot v. Racine Cty., 136 Wis. 2d 57, 63, 400 N.W.2d 917 (1987).

¶34 Contribution claims sometimes occur between joint tortfeasors, or in other circumstances, where one person has paid more than that person's share of a joint obligation. Kafka v. Pope, 194 Wis. 2d 234, 241, 533 N.W.2d 491 (1995) (concluding that "[w]hether the common obligation be imposed by contract or grows out of a tort, the thing that gives rise to the right of

15

contribution is that one of the common obligors has discharged more than his fair equitable share of the common liability.").

¶35 Subrogation may arise in three different forms: contractual, statutory, and equitable subrogation. Estate of Kriefall, 342 Wis. 2d 29, ¶37. In a subrogation claim, the subrogee seeks payment based on rights the subrogee acquired from another. Millers Nat'l Ins. Co. v. City of Milwaukee, 184 Wis. 2d 155, 168, 516 N.W.2d 376 (1994). The "purpose of subrogation is to place the loss ultimately on the wrongdoers." Cunningham v. Metro. Life Ins. Co., 121 Wis. 2d 437, 444, 360 N.W.2d 33 (1985). When express contractual subrogation is claimed, we examine the policy's provisions. Id. at 449. We have given effect to express subrogation clauses contained in insurance contracts. Id. at 446.

¶36 Here, Steadfast's policy expressly provided for subrogation:

> In the event of any payment under this policy, we shall be subrogated to all an "insured's" rights of recovery against any person or organization.

MMSD's right of recovery against Greenwich to which Steadfast is contractually subrogated arises from Greenwich's breach of its contractual obligation to defend MMSD. Accordingly, we examine Steadfast's alleged right of recovery against Greenwich as an express contractual subrogation right that arose from MMSD's right to a defense from Greenwich.

¶37 Subrogation does not change the type of claim for relief that was held by the subrogor. Wilmot, 136 Wis. 2d at 63

16

(explaining that "the identity of a cause of action is not changed by the subrogation, and no new cause of action is created thereby."). Because "[t]he original right of the plaintiff measures the extent of the subrogated party's right," the statute of limitations for a subrogated claim is the same as the statute of limitations that would apply to the claim if it had not been subrogated. Gen. Accident Ins. Co. of Am. v. Schoendorf & Sorgi, 202 Wis. 2d 98, 109, 549 N.W.2d 429 (1996). Wisconsin has a six-year statute of limitations for breach of contract claims. Wis. Stat. § 893.43(1) (2015-16).[8] Steadfast was subrogated to MMSD's contract claim that Greenwich breached its duty to defend.

¶38 Steadfast paid MMSD's debt for defense costs, which included what Greenwich was obligated to provide as well as Steadfast's own portion of MMSD's defense costs, when it paid MMSD $1.55 million. Because subrogation does not change the identity of the cause of action, Steadfast's claim against Greenwich is also for breach of contract. Claims for breach of contract have a six-year statute of limitations. Wis. Stat. § 893.43(1). Steadfast's action was filed less than six years after Greenwich's breach occurred, therefore, it was timely filed.

---

[8] All subsequent references to the Wisconsin Statutes are to the 2015-16 version unless otherwise indicated.

## 4. Allocation of Defense Costs

¶39 Steadfast and Greenwich each had a contractual duty to defend MMSD. Because MMSD chose to pay for its own defense, it incurred $1.55 million in stipulated defense costs. Steadfast paid $1.55 million to MMSD; however, part of that payment was attributable to the defense that Steadfast, itself, was obligated to provide.

¶40 The circuit court and the court of appeals ignored the financial import of Steadfast's own duty to defend MMSD. Instead, both courts focused on Greenwich's failure to defend and adjudged the full amount of MMSD's defense costs as being due from Greenwich to Steadfast.[9] In so doing, they relieved Steadfast of its contractual obligation for defense costs, without recognition of the windfall that Steadfast received from what amounted to a judicial forgiveness of Steadfast's duty to defend MMSD. This placed Steadfast (as subrogee) in a better position than MMSD (the subrogor) from whom Steadfast obtained the contractual right of subrogation. To explain further, MMSD litigated the defense through attorneys of its own choosing, but it received no windfall when it was repaid $1.55 million in litigation costs it actually incurred. Here, Steadfast obtained

---

[9] The circuit court concluded that Greenwich waived the right to raise coverage defenses by its breach of the duty to defend. The court of appeals concluded that because Greenwich breached its duty to defend MMSD, it was not equitably entitled to an allocation of a portion of MMSD's defense costs to Steadfast. Steadfast Ins. Co., 380 Wis. 2d 184, ¶4.

litigation costs beyond what it incurred in satisfying its duty to defend.

¶41 We conclude that both Steadfast and Greenwich had a duty to provide a defense to MMSD. Accordingly, the financial sanction of an insurer who fails in its duty to defend does not include judicial forgiveness of another insurer's financial obligation for defense costs. Therefore, we conclude that the $1.55 million in defense costs that Steadfast paid should be allocated between Steadfast and Greenwich.

¶42 We have not directly addressed the proper formula for allocating defense costs when two insurers have a duty to defend the same insured. See Burgraff v. Menard, Inc., 2016 WI 11, ¶111, 367 Wis. 2d 50, 875 N.W.2d 596 (Roggensack, C.J., dissenting). However, in a well-reasoned opinion, the Utah Supreme Court addressed the question of allocation of defense costs between insurers, each of whom had a duty to defend. Ohio Cas. Ins. Co. v. Unigard Ins. Co., 268 P.3d 180, 185-86 (Utah 2012). In Ohio Cas., the court noted the obligation of each insurer to participate in defense costs and under the facts of Ohio Cas., which involved a long term exposure, the court chose the time-on-risk method of defense cost apportionment.[10]

---

[10] Time-on-risk method of apportionment weights the defense costs by the time that each policy was at risk for actions of its insured that could require coverage. Sharon Steel Corp. v. Aetna Cas. & Sur. Co., 931 P.2d 127, 140 (Utah 1997) (explaining that damages based on the relative period of time for which coverage was provided under each policy is an equitable method of apportionment of defense costs).

19

Apportionment also may be done on an equal division among insurers, and it has been ordered based on respective policy limits. Sharon Steel Corp. v. Aetna Cas. & Sur. Co., 931 P.2d 127, 140 (Utah 1997). In discussions of apportionment, there has been a uniform recognition of the obligation for defense costs that both insurers faced.

¶43 In equal apportionment, defense costs are distributed equally among any insurers with a duty to defend, for example with two insurers each would pay one-half, with three insurers each would pay one-third. See, e.g., Cargill, Inc. v. Ace Am. Ins. Co., 784 N.W.2d 341 (Minn. 2010). This method is easy to apply; however, it could lead to unfairness and upset the parties' reasonable expectations if one insurer insures for lesser policy limits and charges a lower premium. See, e.g., Sharon Steel Corp., 931 P.2d at 140 (pointing out that "insurers do not stand on an equal footing where there are significantly different liability limits.").

¶44 The third option is to apportion defense costs pro rata, based on the parties' policy limits. For example, if insurer A's policy limit is $1 million, and insurer B's policy limit is $2 million, insurer A will be responsible for one-third of defense costs. We have suggested that this is the preferred approach. See Schoenecker, 88 Wis. 2d at 671; Oelhafen, 171 Wis. 2d at 537 ("The proportion [each insurer contributes toward the insured's loss] usually is based on their respective policy limits."). This approach better reflects the insurance companies' respective bargains. See, e.g., Armstrong World

20

_Indus., Inc. v. Aetna Cas. & Sur. Co._, 52 Cal. Rptr. 2d 690, 707 (Cal. Ct. App. 1996) (explaining that apportioning damage reflects that higher premiums generally are paid for higher per person or per liability limits).  Accordingly, we conclude that pro rata allocation based on insurers' policy limits is the best method for apportionment of defense costs in the matter before us.

¶45  Here, Steadfast paid $1.55 million for MMSD's defense costs.  Greenwich and Steadfast have stipulated that this was the "reasonable and necessary" cost of MMSD's defense.  Greenwich's policy limit was $20 million.  Steadfast's policy limit was $30 million.  Therefore, Greenwich owed two-fifths of $1.55 million in defense costs and Steadfast was responsible for three-fifths of those costs.  Accordingly, Steadfast is entitled to recover from Greenwich $620,000, plus interest accruing on that amount from the date of entry of the circuit court's judgment.  Wis. Stat. § 815.05(8).[11]

### 5.  Attorney Fees

¶46  We conclude that Steadfast also is entitled to recover attorney fees from Greenwich under principles of contractual subrogation.  We have held that when an insurer breaches its duty to defend, it may be liable for attorney fees incurred by its insured in successfully establishing coverage.  Elliott v.

---

[11] We do not address whether Wis. Stat. § 628.46 applies to claims made within Steadfast's contractual subrogation clause because neither party addressed § 628.46.

21

Donahue, 169 Wis. 2d 310, 324-25, 485 N.W.2d 403 (1992). See also Newhouse, 176 Wis. 2d at 837 ("[W]here an insurer wrongfully refuses to defend on the grounds that the claim against the insured is not within the coverage of the policy, the insurer is guilty of a breach of contract which renders it liable to the insured for all damages that naturally flow from the breach.").

¶47 As we have explained above, Steadfast had rights of contractual subrogation based on its payment to MMSD. Therefore, Steadfast asserted rights that MMSD had against Greenwich for failing to defend. Stated otherwise, if MMSD were to sue Greenwich to recover defense costs, it would have been entitled to the attorney fees and costs incurred in such litigation. Id. at 838. Here, by virtue of its express subrogation rights, Steadfast stands in MMSD's shoes and seeks attorney fees incurred in obtaining a judgment against Greenwich for payment of defense costs just as MMSD could have recovered were it to have brought this lawsuit.

¶48 Although Wisconsin courts have not yet awarded attorney fees for breach of a duty to defend to an insurer who was subrogated to an insured's rights, neither the principles of contractual subrogation, nor the rationale behind attorney fee awards for breach of a duty to defend, foreclose this result. However, other states have approached this question. The decisions of the Supreme Court of California and of Florida have provided helpful discussions.

22

¶49 In Emp'rs Mut. Liab. Ins. Co. v. Tutor-Saliba Corp., 951 P.2d 420 (Cal. 1998), a subcontractor's employee was injured on the job. The subcontractor's insurer paid worker's compensation, which made it "subrogated to all of the rights and liabilities" of the subcontractor. Id. at 424. The underlying contract between the subcontractor and general contractor stated that in any dispute between the two, the prevailing party was entitled to attorney fees. Id. at 422. The subrogated insurer unsuccessfully sued the general contractor to recover its worker's compensation payment. Id. The California Supreme Court held that as the prevailing party, the general contractor would be entitled to recover attorney fees from the subrogated insurer: "the insurer should likewise be subrogated to——i.e., both benefited and bound by——any contract providing for attorney fees to a prevailing party that the employer and the third party have executed." Id. at 424. While this involved an award of attorney fees against the subrogee, the court held that the subrogee was "both benefited and bound by" the attorney fee provision. Id.

¶50 Florida's supreme court appears to have followed suit. In Cont'l Cas. Co. v. Ryan Inc. E., 974 So. 2d 368 (Fla. 2008), it held that a subrogee surety could not pursue attorney fees against the principal's insurer, but only because the principal still had the right to pursue attorney fees. Id. at 377. If the principal had assigned all its rights to the surety via contractual subrogation, the surety would have been able to recover attorney fees. Id.

23

¶51 Their reasoning is persuasive. We conclude that a contractual subrogee's right to recovery may include an award of attorney fees the subrogor would have been entitled to receive had it brought the lawsuit. We have long recognized that contractual subrogation "entitl[es] the paying party to rights, remedies, or securities that would otherwise belong to the debtor." Dufour, 370 Wis. 2d 313, ¶15; see also Wilmot, 136 Wis. 2d at 63. We decline to create an exception to this longstanding rule by excluding attorney fees from the bundle of contractual subrogation rights that arise from a specific subrogation clause upon payment by the subrogee.

¶52 In this case, Greenwich breached its duty to defend, so MMSD had the right to request attorney fees for successfully establishing Greenwich's obligation to defend. Steadfast's contract with Veolia and MMSD stated in relevant part: "In the event of any payment under this policy, we shall be subrogated to all an 'insured's' rights of recovery against any person or organization." Because MMSD's "rights of recovery" against Greenwich would include attorney fees incurred in successfully establishing coverage, Steadfast is entitled to recover $325,000 in attorney fees from Greenwich as MMSD's subrogee, plus interest accruing on that amount from the date of entry of the circuit court's judgment. Wis. Stat. § 815.05(8). Furthermore, nothing in this opinion prevents Steadfast from moving the circuit court for an award of attorney fees incurred in litigating the appeal and our review herein.

24

### III.  CONCLUSION

¶53 First, we conclude that Greenwich, who insured the risk that United Water would negligently perform services for MMSD, thereby causing damage, and Steadfast, who for a different period of time insured the risk that Veolia would negligently perform services for MMSD, thereby causing damage, were both primary and successive insurers in regard to MMSD, their common additional insured.

¶54 Second, we conclude that Greenwich breached its contractual duty to defend MMSD.  Third, we conclude that Steadfast's contractual subrogation claim against Greenwich was timely filed as it comes within the six-year statute of limitations for contract actions.

¶55 Fourth, we apply a pro-rata allocation of defense costs Steadfast paid to MMSD based on Steadfast's and Greenwich's respective policy limits of $30 million and $20 million.  Fifth, and finally, we conclude that Steadfast is entitled to recover attorney fees from Greenwich due to Steadfast's stepping into the shoes of MMSD through contractual subrogation to force Greenwich to pay defense costs.

¶56 Accordingly, we affirm the decision of the court of appeals in part and reverse it in part.

*By the Court.*—The decision of the court of appeals is affirmed in part and reversed in part.

25

¶57 ANN WALSH BRADLEY, J. *(concurring in part, dissenting in part).* I agree with the majority that the "other insurance" provisions are not triggered. Additionally, I agree that Greenwich breached its duty to defend, and that Steadfast's claim sounds in subrogation and not contribution.[1]

¶58 I write separately, however, because the majority errs in two ways. First, it allocates defense costs between Steadfast and Greenwich, allowing Greenwich to breach its duty to defend with impunity. Second, it awards attorney fees to Steadfast in derogation of the longstanding American Rule.

¶59 An insurer that breaches the duty to defend should not be able to escape liability for the consequences of its behavior. Our case law is clear that an insurer who refuses to defend its insured proceeds at its own peril. Olson v. Farrar, 2012 WI 3, ¶30, 338 Wis. 2d 215, 809 N.W.2d 1.

¶60 Yet, the majority extinguishes the peril, allowing a breaching insurer to refuse to uphold its duty to defend with the security that it will suffer no financial consequence. In doing so, it encourages a game of chicken between insurers that may leave the insured as the only loser.

¶61 Further, our case law dictates that exceptions to the American Rule be limited and narrow. Nevertheless, the majority goes where no court has previously ventured.

¶62 In expanding the exception to the American Rule by awarding attorney fees from one insurance company to another,

---

[1] I join parts II.B.1, II.B.2, and II.B.3 of the majority opinion.

one wonders what is next. The majority's determination crafts a new exception to the American Rule that is unsupported by case law and that chips away at the vitality of the Rule. I fear that "once the camel's nose is in the tent, the rest will likely follow."

¶63 Accordingly, I concur in part and dissent in part.[2]

I

¶64 The majority errs first in its determination that Greenwich is not liable for the entirety of MMSD's defense costs. Instead, it pro-rates costs, turning the purpose of this court's coverage framework on its head and creating a perverse incentive for insurers to fail to uphold their duty to defend.

¶65 As the majority recognizes, this court has established a preferred framework for an insurance company to follow when it disputes coverage. Majority op., ¶29 (citing Wis. Pharmacal Co., LLC v. Neb. Cultures of Cal., Inc., 2016 WI 14, ¶18, 367 Wis. 2d 221, 876 N.W.2d 72). Pursuant to such a framework, "the proper procedure for an insurance company to follow when coverage is disputed is to request a bifurcated trial on the issues of coverage and liability and move to stay any proceedings on liability until the issue of coverage is resolved." Newhouse by Skow v. Citizens Sec. Mut. Ins. Co., 176 Wis. 2d 824, 836, 501 N.W.2d 1 (1993) (citing Elliott v. Donahue, 169 Wis. 2d 310, 318, 485 N.W.2d 403 (1992)). When an

---

[2] I dissent from parts II.B.4 and II.B.5 of the majority opinion.

insurer follows this procedure, the insurer runs no risk of breaching its duty to defend. Id.

¶66 An insurer who unilaterally refuses to defend does so at its own peril. Olson, 338 Wis. 2d 215, ¶30. Accordingly, the "general rule is that where an insurer wrongfully refuses to defend on the grounds that the claim against the insured is not within the coverage of the policy, the insurer is guilty of a breach of contract which renders it liable to the insured for all damages that naturally flow from the breach." Newhouse, 176 Wis. 2d at 837.

¶67 Indeed, this court in Water Well Solutions Serv. Group, Inc. v. Consolidated Ins. Co. recently warned that "an insurer opens itself up to a myriad of adverse consequences if its unilateral duty to defend determination turns out to be wrong." 2016 WI 54, ¶28, 369 Wis. 2d 607, 881 N.W.2d 285. An insurer's liability "may potentially be greater than what the insurer would have paid had it defended its insured in the first instance . . . ." Id.

¶68 Our established framework encourages insurers to fulfill their duty to defend and thereby avoids negative outcomes for both insurers and insureds. "A unilateral refusal to defend without first attempting to seek judicial support for that refusal can result in otherwise avoidable expenses and efforts to litigants and courts, deprive insureds of their contracted-for protections, and estop insurers from being able to further challenge coverage." Liebovich v. Minnesota Ins. Co., 2008 WI 75, ¶55, 310 Wis. 2d 751, 751 N.W.2d 764.

¶69 The majority effectively rewards Greenwich for ignoring this court's established framework and allows Greenwich to escape the consequences of its willful breach of the duty to defend. By allowing Greenwich to pay pro-rated costs, the majority lessens the impact of the insurer's breach of the duty to defend. It further encourages future insurers to follow a similar course rather than seeking a bifurcated coverage trial as this court has recommended numerous times.

¶70 According to the majority, Greenwich should suffer no consequence at all for breaching the duty to defend. It pays merely what it would have paid anyway if it had lived up to its duty to defend in the first instance.

¶71 The result of the majority opinion is the proliferation of a game of chicken between insurers. See Southeast Wis. Prof'l Baseball Park Dist. v. Mitsubishi Heavy Indus. Am., Inc., 2007 WI App 185, ¶64, 304 Wis. 2d 637, 738 N.W.2d 87. When there are two or more insurers from whom coverage is sought, what incentive is there to provide coverage if an insurer can simply refuse to defend the case and end up paying the exact same amount later in the event it is sued? Each insurer would simply hold out and hope that someone else takes on the defense.

¶72 Rather than encouraging insurers to live up to their contractual obligations, the majority opinion allows insurers to rest comfortably in their decisions to deny a defense with the knowledge that if a breach is later found, no financial consequence will be forthcoming. The only loser in this game is

the insured, who may be forced to expend resources for a defense that should have been covered by insurance from the beginning.

¶73 Unlike the majority, I conclude that there must be some element of penalty and deterrence to encourage insurance companies to defend when they are obligated. See Water Well, 369 Wis. 2d 607, ¶28. I thus determine that Greenwich is liable for the full cost of MMSD's defense.

¶74 My conclusion is further buttressed by the fact that Greenwich's insurance policy does not contain a pro-ration clause. Where a policy contains no pro-ration language, this court is not to rewrite the policy to include it. Plastics Eng'g Co. v. Liberty Mut. Ins. Co., 2009 WI 13, ¶59, 315 Wis. 2d 556, 759 N.W.2d 613. Yet by pro-rating defense costs, the majority gives Greenwich the benefit of a bargain it did not make.

¶75 Accordingly, I dissent from part II.B.4 of the majority opinion, which effectively eliminates any incentives for insurance companies to promptly defend lawsuits and fails to encourage insurers to follow this court's preferred framework for determining insurance coverage.

II

¶76 The majority errs further in its determination that Steadfast is entitled to attorney fees incurred in litigating this case. It fails to heed this court's warning that exceptions to the American Rule are to be limited and narrow. Instead, it opens up a new exception that is contrary to clear precedent that arrives at a directly opposite outcome.

5

¶77 Generally, we adhere to the American Rule, which provides that parties to litigation are responsible for their own attorney fees unless recovery is expressly allowed by either contract or statute, or when recovery results from third-party litigation. DeChant v. Monarch Life Ins. Co., 200 Wis. 2d 559, 571, 547 N.W.2d 592 (1996). Absent statutory authority or a contractual provision to the contrary, Wisconsin courts strictly follow this rule. Id.

¶78 In the insurance coverage context, analysis of entitlement to attorney fees begins with Elliott v. Donahue, 169 Wis. 2d 310. The Elliott court determined that Wis. Stat. § 806.04(8), "which recognizes the principles of equity, permits the recovery of reasonable attorney fees incurred by the insured in successfully establishing coverage." Id. at 314. It concluded that attorney fees were appropriate under the specific facts that were present:

> The insurer that denies coverage and forces the insured to retain counsel and expend additional money to establish coverage for a claim that falls within the ambit of the insurance policy deprives the insured the benefit that was bargained for and paid for with the periodic premium payments. Therefore, the principles of equity call for the insurer to be liable to the insured for expenses, including reasonable attorney fees, incurred by the insured in successfully establishing coverage.

Id. at 322.

¶79 Subsequent case law has limited the application of Elliott to its facts. Specifically, in Riccobono v. Seven Star, Inc., the court of appeals denied a claim for attorney fees by one insurer against a second insurer. 2000 WI App 74, 234

6

Wis. 2d 374, 610 N.W.2d 501. The Riccobono court reasoned: "In defining the dispute in Elliott, the supreme court stated: 'The sole issue on review concerns whether an insured may recover attorney fees incurred in successfully defending coverage under an insurance policy.'" Id., ¶22. It then distinguished the facts present in Riccobono from those in Elliott, writing that "Society is not an insured and, thus, does not appear to fall within the holding of the supreme court." Id., ¶22.

¶80 The Riccobono court found it dispositive that the identity of the party seeking attorney fees was an insurer and not an insured. On this issue, Riccobono is on all fours with this case. Curiously, the majority fails to even mention Riccobono.

¶81 Despite the majority's silence, Riccobono instructs that attorney fees are not available to Steadfast because it is an insurer, and not an insured. Even with such an instruction in hand, an additional step is required in the analysis due to

7

the fact that Steadfast's claim is one for subrogation, i.e., it steps into the shoes of its insured.[3]

¶82 Finding the nature of Steadfast's subrogation claim dispositive, the majority turns to the case law of other jurisdictions in support of its result. Majority op., ¶¶48-51. Because MMSD would have been entitled to attorney fees, the majority reasons, so is Steadfast. Id., ¶47. I do not find this approach persuasive.

¶83 The court of appeals in Riccobono was clear that Elliott "does not encompass the payment of attorney fees and costs from one insurer to another . . . ." 234 Wis. 2d 374, ¶2. The driving factor behind the Elliott decision was that the insured retained independent counsel who established that coverage existed. See Gorton v. Hostak, Henzl & Bichler, S.C., 217 Wis. 2d 493, ¶¶32-33, 577 N.W.2d 617 (1998).

---

[3] Although the insurer requesting attorney fees in Riccobono sought such fees pursuant to a theory of subrogation, the court of appeals did not address this argument because it determined that the insurer was not entitled to subrogation under the language of the policy. Riccobono v. Seven Star, Inc., 2000 WI App 74, ¶28, 234 Wis. 2d 374, 610 N.W.2d 501. As the court stated, "the conditions under which Society might have been subrogated to Seven Star's right to attorney fees and costs never came into fruition." Id., ¶28. Nevertheless, the Riccobono court's declaration that attorney fees are not available under Elliott when one insurer seeks attorney fees from another insurer is consistent with this court's previous reluctance to extend Elliott beyond its particular facts and circumstances regardless of whether the insurer is a subrogated party. See DeChant v. Monarch Life Ins. Co., 200 Wis. 2d 559, 569, 547 N.W.2d 592 (1996); Elliott v. Donahue, 169 Wis. 2d 310, 485 N.W.2d 403 (1992).

¶84 This court has expressly declined to extend Elliott beyond its particular facts and circumstances. Id., ¶33 (citing DeChant, 200 Wis. 2d at 569); see also Reid v. Benz, 2001 WI 106, ¶13, 245 Wis. 2d 658, 629 N.W.2d 262 ("The facts and circumstances that gave rise to our decision in Elliott are particularly significant, because our reasoning therein is inextricably connected to those facts and circumstances."). Instead, we have adhered to the maxim that exceptions to the American Rule should be "limited and narrow." Gorton, 217 Wis. 2d 493, ¶33; Nationstar Mortg. LLC v. Stafsholt, 2018 WI 21, ¶27, 380 Wis. 2d 284, 908 N.W.2d 784. "Awarding attorney fees, as we did in Elliott, should not be the usual result." Reid, 245 Wis. 2d 658, ¶27.

¶85 Although generally Steadfast steps into MMSD's shoes when pursuing a subrogation claim, to do so here flies in the face of clear precedent. To allow such subrogated status to one insurer seeking to recover attorney fees from another insurer extends far beyond the "particular facts and circumstances" of Elliott. See DeChant, 200 Wis. 2d at 569. Unlike the majority, I would follow our case law indicating that such exceptions to the American Rule must be narrowly circumscribed.

¶86 Accordingly, I dissent from part II.B.5 of the majority opinion because it allows an insurer to recover attorney fees from another insurer, contravening the long-established American Rule.

¶87 In sum, for the reasons set forth above, I respectfully concur in part and dissent in part.

9

¶88  I am authorized to state that Justice REBECCA FRANK DALLET joins this concurrence/dissent.

¶89 REBECCA GRASSL BRADLEY, J. *(concurring in part, dissenting in part).* I agree with the majority that an insured's defense costs should be allocated between insurers who share a contractual, overlapping duty to defend the insured. I also agree that the allocation between insurers should be pro rata, based upon each insurer's policy limits. Accordingly, I join part II.B.4 of the majority opinion to the extent it adopts these legal principles. However, I disagree with the majority's conclusion that Greenwich is responsible for any portion of defense costs paid on behalf of MMSD. Vis-à-vis Steadfast's policy of insurance covering MMSD, Greenwich's policy was excess over Steadfast's, relieving Greenwich of any obligation to contribute to MMSD's defense, which Steadfast was already providing. The majority erroneously concludes otherwise, deeming both Steadfast and Greenwich to be primary insurers, each with a duty to defend MMSD in the consolidated lawsuits stemming from the 2008 rain event. In reaching this result, the majority declines to apply clear and unambiguous policy language dictating a different priority of insurance, instead applying an offhanded statement in a case involving an unrelated issue with no application here. The majority errs. I would reverse the judgment against Greenwich in its entirety.[1]

---

[1] Because I conclude that Greenwich had no duty to defend, I do not address the remaining issues resolved by the majority because they are moot unless Greenwich had a duty to defend. I do agree with Justice Ann Walsh Bradley's dissent to the extent it would deny recovery of attorney fees by one insurer against another.

I

¶90 Insurance policies are contracts. Wadzinski v. Auto-Owners Ins. Co., 2012 WI 75, ¶11, 342 Wis. 2d 311, 818 N.W.2d 819. When interpreting contracts, we presume the parties' intentions are expressed in the language they chose. Id. Accordingly, when construing policy terms and conditions, we begin with their plain language. See Johnson Controls, Inc. v. London Mkt., 2010 WI 52, ¶59, 325 Wis. 2d 176, 784 N.W.2d 579 ("Wisconsin case law instructs that the language of the policy should be our initial focus."); see also BV/B1, LLC v. InvestorsBank, 2010 WI App 152, ¶25, 330 Wis. 2d 462, 792 N.W.2d 622 ("When interpreting a contract clause, we begin with the plain language of the clause."). "When the language of [an insurance] contract is unambiguous, we apply its literal meaning." Wisconsin Label Corp. v. Northbrook Prop. & Cas. Ins. Co., 2000 WI 26, ¶23, 233 Wis. 2d 314, 607 N.W.2d 276. Interpretation of policy language is a question of law we review de novo. Wadzinski, 342 Wis. 2d 311, ¶10.

¶91 As a general rule, a primary insurer "has the primary duty to defend a claim" while an excess insurer is not required to contribute to the defense as long as "the primary insurer is required to defend." Johnson Controls, Inc., 325 Wis. 2d 176, ¶57 (quoted source omitted). "Whenever two policies apply to the same insured at the same time, the issue of which policy must pay first—or which is primary and which is excess—is dealt with by other insurance clauses." Burgraff v. Menard, Inc., 2016 WI 11, ¶27, 367 Wis. 2d 50, 875 N.W.2d 596 (quotation

2

marks and quoted source omitted). In such situations, the insurers may, by the terms of their policies, "define the extent to which each is primary and each excess[.]" Wis. Stat. § 631.43(1); see also Burgraff, 367 Wis. 2d 50, ¶27.[2] Regardless of its status as primary or excess, whether an insurer has a duty to defend "depends on the language of the policies." Johnson Controls, Inc., 325 Wis. 2d 176, ¶58 (emphasis added).

## II

¶92 While Steadfast and Greenwich issued their respective policies to two different primary insureds, neither party disputes that both policies cover the same additional insured: MMSD. It is MMSD's losses——namely, defense costs——that are at issue in this case. Therefore, the focus should be on MMSD as the insured, not United Water or Veolia. Instead, the majority views coverage from the standpoint of the primary insureds—— United Water and Veolia——who are entirely removed from this coverage litigation: "Greenwich's policy insured the risk that United Water's conduct in managing the Milwaukee sewerage system during the policy period would be negligent . . . Steadfast's policy insured the risk that Veolia would negligently manage the Milwaukee sewerage system during the policy period[.]" Majority op., ¶¶23, 24. The negligence of United Water and Veolia are irrelevant for purposes of determining the respective insurers'

---

[2] This holds true unless "the policies contain inconsistent terms on that point," in which case "the insurers shall be jointly and severally liable to the insured on any coverage where the terms are inconsistent[.]" Wis. Stat. § 631.43(1).

duty to defend MMSD, a different insured altogether. By framing the issue incorrectly, the majority's analysis collapses at the outset.

¶93 The language of Greenwich's and Steadfast's insurance contracts determines whether Greenwich and Steadfast provide primary or excess coverage to MMSD. Under the "PROFESSIONAL LIABILITY" section of its policy, Greenwich agreed "[t]o pay on behalf of the INSURED all LOSS in excess of the Retention amount . . . as a result of CLAIMS first made against the INSURED . . . during the POLICY PERIOD . . . by reason of any act, error or omission in PROFESSIONAL SERVICES rendered . . . by the INSURED or by any person whose acts, errors or omissions the INSURED is legally responsible."[3] Under the separate "CONTRACTOR'S POLLUTION LEGAL LIABILITY" section of its policy, Greenwich agreed "[t]o pay on behalf of the INSURED all LOSS, in excess of the Retention amount . . . as a result of an OCCURRENCE which arises out of CONTRACTING SERVICES and which first commenced during the POLICY PERIOD." Under the policy, "LOSS"——what Greenwich is contractually obligated to pay to or on behalf of MMSD——means not only "DAMAGES [i.e., a "monetary judgment, award or settlement of compensatory damages"] which the INSURED shall become legally obligated to pay as a result of a CLAIM" but also "CLAIMS EXPENSE." Under the policy, "CLAIMS EXPENSE" includes "all other fees, costs . . . and expenses resulting from the . . . defense . . . of such CLAIM, if

---

[3] Capitalization appears in Greenwich's policy to signify defined terms.

incurred . . . with the written consent of the Company, by the INSURED." In simpler terms, Greenwich insured MMSD not only for "DAMAGES" MMSD would become legally obligated to pay as a result of a covered claim (here there were none) but also "CLAIMS EXPENSE," which includes attorney fees incurred by MMSD in defending against such a claim, regardless of whether MMSD became legally obligated to pay damages to a third party. Despite the fact that only "CLAIMS EXPENSE" and not "DAMAGES" are at issue in this case, the majority ignores in its analysis of Greenwich's duty to defend the fact that "CLAIMS EXPENSE" constitutes MMSD's exclusive "LOSS."

¶94 Steadfast's policy similarly promises to "pay on behalf of an 'insured' any 'loss' an 'insured' is legally obligated to pay as a result of a 'claim[.]'" Steadfast's policy defines "Loss" to mean both (1) "Compensatory damages or legal obligations arising from 'Bodily injury'" or "Property damage" and (2) "Related 'claim expense.'" Under Steadfast's policy, "Claim expenses" include attorney fees and "[a]ll other fees, costs and expenses resulting from the defense . . . of a 'claim' if incurred by" Steadfast or MMSD with Steadfast's consent.

¶95 In the underlying rain event litigation, no damages were awarded or paid to the plaintiffs for their claims against MMSD. MMSD sustained no "loss" under the first prong of that definition in either Greenwich's or Steadfast's policies. Instead, MMSD's "loss" as defined in each policy was limited to attorney fees incurred in defending against the rain event

claims, included under the second prong of "loss" in each policy and denominated as "CLAIMS EXPENSE" under Greenwich's policy and as "Claim expenses" under Steadfast's policy. Although MMSD was never found liable in the rain event litigation, nor did it agree to pay damages in settlement of that litigation, MMSD did incur an insurable loss under the policies, in the form of attorney fees incurred in its defense.

¶96 At this step in the analysis, I conclude that both Greenwich and Steadfast contractually agreed to pay MMSD's attorney fees in defending the rain event litigation. The analysis does not end there, however, because of course MMSD is not entitled to recover double its attorney fees, nor was MMSD entitled to duplicative defenses against the rain event claims. If multiple policies cover the same insured during the same period, then the policies' respective "other insurance" provisions determine which insurer is primary and which is excess.

¶97 Greenwich's "other insurance" clause in its policy insuring MMSD provides in pertinent part: "this insurance <u>shall be in excess of</u> the Retention amount . . . and <u>any other valid and collectible insurance available to the INSURED</u> . . . unless such other insurance is written only as a specific excess insurance over the Limits of Liability provided in this policy." (Emphasis added.) While Greenwich contractually declares its insurance to be excess if other valid and collectible insurance is available to MMSD, Steadfast's "other insurance" provision is

markedly different. Steadfast designates its insurance as primary unless other primary insurance is available to MMSD:

> L. OTHER INSURANCE
>
> 1. The insurance provided under this policy is primary insurance, except when:
>
> a. Stated in the Declarations or by endorsement to apply in excess of or contingent upon the absence of other insurance; or
>
> b. Any other primary insurance is available covering liability for any "claim" or "loss" . . . .
>
> When this insurance is primary and the "insured" has other insurance which is stated to be applicable to the "claim" or "loss" on an excess basis, the amount of our liability under this policy shall not be reduced by the existence of such excess insurance.

(Emphasis added.) Both Greenwich and Steadfast agreed to pay MMSD's "loss" in the form of attorney fees incurred in defending the rain event litigation. Because Steadfast's policy provided valid and collectible insurance to MMSD for this particular loss, Greenwich's insurance covering this loss—attorney fees— is excess. Steadfast's own policy declares its coverage to be primary unless (1) otherwise stated in the declarations or an endorsement, or (2) any other primary insurance is available. Neither condition exists under these facts.

¶98 No one disputes Steadfast had a duty to defend MMSD against the entire litigation, even though not all claims implicated Veolia, Steadfast's primary insured. See Fireman's Fund Ins. Co. of Wis. v. Bradley Corp., 2003 WI 33, ¶21, 261 Wis. 2d 4, 660 N.W.2d 666 ("[W]hen an insurance policy provides coverage for even one claim made in a lawsuit, the insurer is

7

obligated to defend the entire suit.") Steadfast's "other insurance" provision states that its policy provides primary coverage. Greenwich also promised coverage for MMSD's defense costs, but its "other insurance" provision states that Greenwich's coverage is excess to any other valid and collectible insurance. Steadfast's contractual obligation to pay MMSD's defense costs constitutes "other valid and collectible insurance," rendering Greenwich an excess insurer as to that loss.

¶99 Despite this straightforward and unambiguous policy language, the majority declines to interpret the "other insurance" clauses, inexplicably stating that "we do not interpret the terms of the 'other insurance' clauses because under the undisputed facts . . . Greenwich's 'other insurance' clause provided successive insurance to MMSD." Majority op., ¶27. The majority does not explain how an "other insurance" clause grants any coverage to an insured. Although the majority contradictorily appears to have engaged in <u>some</u> interpretation of Greenwich's "other insurance" clause (but not Steadfast's), it does not include its analysis of that provision in the opinion. Instead, the majority examines only the "damages" aspect of "loss" despite the absence of any "damages" incurred by MMSD. Based solely on the "damages" for which MMSD could have been held liable (but was not), the majority holds that both insurers provided primary coverage "in regard to insuring MMSD's risk of damage[,]" majority op., ¶27, and therefore both had a duty to defend. Majority op., ¶39. The majority's

8

disregard for the actual and only "loss" incurred by MMSD——attorney fees——generates its analytical error.

¶100 The majority concludes that "concurrent insurance is required before 'other insurance' clauses are triggered." Majority op., ¶26. But the majority ignores the concurrent coverage of the claim expense "loss" incurred by MMSD——attorney fees——during overlapping policy periods. No one disputes that both policies covered the 2008 rain event; therefore, the majority's conclusion that the policies were successive is logically impossible. The majority then quotes Plastics Engineering[4] for the proposition that "[t]wo insurance policies cannot be concurrent unless they insured 'the same risk, and the same interest, for the benefit of the same person, during the same period.'" Majority op., ¶26. Relying upon the different contractors insured by each policy rather than the common insured (MMSD), the majority concludes that the policies were successive, not concurrent. This contradicts the actual language of the policies, which should have been the focus of analysis in this case.

¶101 The majority's reliance on Plastics Engineering is misplaced. The case did not, as the majority maintains, hold that "[t]wo insurance policies cannot be concurrent unless they insured 'the same risk, and the same interest, for the benefit of the same person, during the same period.'" Majority op., ¶26. Rather, the case addressed whether Wis. Stat. § 631.43(1)

---

[4] Plastics Eng'g Co. v. Liberty Mut. Ins. Co., 2009 WI 13, ¶48, 315 Wis. 2d 556, 759 N.W.2d 613.

applies to successive policies; it did not address "other insurance" clauses at all. Plastics Eng'g Co. v. Liberty Mut. Ins. Co., 2009 WI 13, ¶44, 315 Wis. 2d 556, 759 N.W.2d 613. The language the majority quotes from Plastics Engineering was lifted from an explanatory parenthetical in a citation to a law review article. Id., ¶48 (quoting Douglas R. Richmond, Issues and Problems in "Other Insurance," Multiple Insurance, and Self-Insurance, 22 Pepp. L. Rev. 1373, 1376-82 (1995)).[5] Nothing in Plastics Engineering should be read as supplanting the actual policy language, which forms the contract between insurer and insured, with a mechanical analysis of whether the policies cover "the same risk, and the same interest, for the benefit of the same person, during the same period." Significantly, Greenwich's "other insurance" clause does not limit its excess position to only those policies insuring "the same risk, and the same interest, for the benefit of the same person, during the same period." Instead, Greenwich's insurance is excess if there is other valid and collectible insurance for the insured's loss——here, MMSD's attorney fees.

¶102 The majority effectively discards the policy language in favor of loose generalizations from our case law. Whether Greenwich's policy was primary or excess (and whether Greenwich violated its contractual obligations) should be resolved by the

---

[5] In context, this statement appears to reflect a general description of how "other insurance" clauses operate. But a general description of how courts have dealt with "other insurance" clauses cannot rewrite the policy language the court is supposed to interpret and apply.

actual language of the insurance contracts that govern our analysis. See Johnson Controls, Inc., 325 Wis. 2d 176, ¶58 (whether a duty to defend exists depends on the language of the policies). Instead, the majority centers its holding on a stray citation to a law review article, resulting in a misguided fixation on the claims made in the rain event litigation rather than MMSD's actual "loss."

¶103 It is true that Greenwich had a duty to indemnify MMSD for "damages" MMSD may have been liable to pay as a result of the acts or omissions of United Water, while Steadfast had a duty to indemnify MMSD for damages MMSD may have been liable to pay as a result of the acts or omissions of Veolia. However, indemnification for such damages is not the issue here. MMSD did not incur any loss based on the acts or omissions of its contractors. Instead, the issue is which insurer was primary as to claim expenses, not damages. Both Greenwich and Steadfast insured the same "loss," namely, MMSD's defense of the rain event litigation, and both policies were in effect for overlapping periods of time.[6] Because Steadfast provided other valid and collectible insurance for the attorney fees necessary to defend against the rain event litigation, Greenwich's policy

---

[6] Greenwich's pollution policy period was July 24, 2007 to July 24, 2008, and Steadfast's claims-made policy period was July 1, 2008 to July 1, 2009, with retroactive dates varying by coverage type and ranging from March 1, 1998 to June 11, 2008.

11

provided excess coverage. Notably, MMSD <u>did collect</u> its defense costs from Steadfast.[7]

¶104 Nothing prohibits an insurer from denying its insured's tender of defense and stating the grounds for this denial. <u>See</u> <u>Water Well Sols. Serv. Grp. Inc. v. Consolidated</u> <u>Ins. Co.</u>, 2016 WI 54, ¶28, 369 Wis. 2d 607, 881 N.W.2d 285. While the insurer takes the risk that its coverage position will later be found incorrect, <u>see</u> <u>id.</u>, there is nothing improper about taking this course of action, as Greenwich did. Based on its policy language and the existence of other valid and collectible insurance, Greenwich correctly determined that any coverage under its policy for MMSD's claim expenses necessary to defend the rain event litigation was excess to Steadfast's. It is irrelevant that Greenwich might ultimately have been liable to indemnify MMSD for any <u>damages</u> awarded against MMSD as a result of United Water's services; Steadfast was obligated to pay all the claim expenses necessary to resolve the entire litigation, and in fact Steadfast did so. An "insurer breaches the duty to defend by requiring the insured to incur attorney fees to defend . . . on the issue of liability and to litigate coverage simultaneously." <u>Reid v. Benz</u>, 2001 WI 106, ¶3, 245

---

[7] Steadfast maintains that Greenwich's "other insurance" clause does not apply because Steadfast's policy was not collectible, arguing that "MMSD will never be able to 'collect' on the Steadfast policy for any liability due to the vicarious liability of United Water." Steadfast commits the same error as the majority by focusing exclusively on the claims for damages instead of the common loss insured by both Greenwich and Steadfast: defense costs.

Wis. 2d 658, 629 N.W.2d 262. In this case, Steadfast paid MMSD's attorney fees incurred to defend against the rain event litigation; MMSD was not forced to bear the expense. And Steadfast——not MMSD——litigated coverage for defense costs. Accordingly, Greenwich did not breach any duty to defend MMSD; as an excess insurer with respect to defense costs, Greenwich had no obligation to provide a defense that MMSD was already receiving from its primary insurer.

¶105 The majority disregards applicable policy language, upsets the insurers' contractual allocation of risk, and binds Greenwich to a risk for which it did not bargain. I would apply the "other insurance" provisions of each contract and therefore reverse the judgment against Greenwich in its entirety, holding Greenwich had no duty to defend MMSD because its policy provided only excess coverage for MMSD's defense costs. Other than the principles of law regarding the pro rata allocation of defense costs between insurers set forth in part II.B.4 of the majority opinion, I respectfully dissent.